**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

_____

|  |  |  |
|---|---|---|
| **SHARON NOBREGA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. _____** |
| | ) | |
| **AMERICAN AIRLINES, INC.** | ) | <u>**Jury Demanded**</u> |
| **4333 Amon Carter Boulevard** | ) | |
| **Fort Worth, Texas 76155** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **COMMUNICATIONS WORKERS OF** | ) | |
| **AMERICA** | ) | |
| **501 Third Street NW** | ) | |
| **Washington, DC 20001,** | ) | |
| | ) | |
| **Defendants.** | ) | |

_____ )

Plaintiff, Sharon Ms. Nobrega ("Plaintiff" or "Ms. Nobrega") by and through her attorneys, The Law Office of Gerald L. Gilliard, Esq., LLC, and as for her complaint against the above captioned defendants ("Defendants"), states and alleges as follows:

## PARTIES, JURISDICTION AND VENUE

1.      Plaintiff is a citizen and resident of Prince Georges County, Maryland. She was an Customer Service Agent employed by American Airlines at Reagan National Airport in Arlington, Virginia.  She is also a member of CWA Local 2252 of the union Communications Workers of America.

2.      Defendant Communications Workers of America (CWA or "the union") is a union and through CWA Local 2252, is the certified collective bargaining representative for all American Customer Service Agents at Reagan National Airport.  Upon information and belief,

CWA, which is incorporated in and maintains its headquarters in the District of Columbia, also maintains several local labor offices ("Locals") at airport hubs and other locations around the country, such as its CWA Local 2252 office located at 2915 Hunter Mill Road, Suite 13, Oakton, Virginia 22124 in Oakton, Virginia.  CWA Local 2252 is a "representative" as that term is defined in the Railway Labor Act, 45 U.S.C. § 151.

3.      Defendant American Airlines, Inc. ("American") is a publicly held Texas corporation, a foreign corporation, doing business in the Commonwealth of Virginia.  American is a "common carrier by air engaged in interstate … commerce" under 45 U.S.C. § 181. American is therefore subject to the Railway Labor Act, 45 U.S.C. § 151-188. American is headquartered in Fort Worth, Texas.

4.      Subject-matter jurisdiction exists under 28 U.S.C. § 1331 because this action arises under the Railway Labor Act, and under 28 U.S.C. § 1332 because the parties are of diverse citizenship and more than $75,000 is in controversy. Supplemental jurisdiction exists under 28 U.S.C. § 1367 over all claims over which it does not have original jurisdiction since all claims arise out of American's and CWA's mistreatment of Ms. Nobrega beginning on December 19, 2018.

5.      Personal jurisdiction over American exists because American conducts extensive administrative, flight, and maintenance operations at Reagan National Airport in Arlington, Virginia.

6.      Personal jurisdiction over CWA exists because CWA conducts extensive operations at Reagan National Airport in Arlington, Virginia (and also at Dulles Airport, in Dulles, Virginia), maintains a CWA Local 2252 office in Oakton, Virginia, and represents union members at Reagan National Airport and through its union local office in Oakton.

7.     Venue is proper in this district under 28 U.S.C. § 1391 and 29 U.S.C. § 185(c) ("district courts shall be deemed to have jurisdiction of a labor organization (1) in the district in which such organization maintains its principal office, or (2) in any district in which its duly authorized officers or agents are engaged in representing or acting for employee members") because CWA acts for its members in Arlington through the Oakton CWA Local 2252 office and because a substantial part of the acts giving rise to this action took place in Arlington, Virginia.

8.     Virginia substantive law applies to any state-law claims alleged in amended versions of this Complaint, because Virginia is the state with the greatest connection to the events here described.

## STATUTE OF LIMITATIONS

9.     A six-month limitations period applies to Ms. Nobrega's hybrid duty of fair representation claims.   For hybrid § 301 claims, the applicable six-month statute of limitations begins to run when "the plaintiff knows or should have known that a violation of his rights has occurred," or when a plaintiff "discovers, or in the exercise of reasonable due diligence should have discovered, the acts constituting the alleged violation." *Gilfillan v. Celanese Ag*, 24 F. App'x 165, 167 (4th Cir. 2001). This happened no earlier than February 6, 2020, when Ms. Nobrega received in the mail a letter dated January 23, 2020 from CWA Secretary-Treasurer Sara Steffens indicating that would not submit her grievance to the Systems Board of Adjustment, and would not pursue other arbitration. Although a hybrid § 301 case involves separate breaches by the employer and the union, the claims accrue only when the plaintiff knows or should have known of the Union's alleged breach of the duty of fair representation. *See White v. White Rose Food, a Div. of DiGiorgio Corp.*, 128 F.3d 110, 114 (2d Cir. 1997) (cited in *Mvuri v. Am. Airlines, Inc.*, Case No. 1:18-cv-875 (E.D. Va. 2019) (Fastcase)); *see also Ryder v.*

3

*Phillip Morris, Inc*., 946 F. Supp. 422, 429 (E.D. Va. 1996). The statute of limitations was tolled

during Ms. Nobrega's pursuit of internal union remedies. *Crawford v. Air Line Pilots Ass'n*

*Intern*., 870 F.2d 155, 159 (4th Cir. 1989) (citing *Galindo v. Stoody Co*., 793 F.2d 1502, 1510

(9th Cir.1986) (duty of fair representation claim "tolled while good faith attempts are made to

resolve that claim through grievance procedures")); *cf. Trent v. Bolger*, 837 F.2d 657, 659-60

(4th Cir. 1988).  Because this action was filed within six months from February 6, 2020, it is

timely.

## FACTS

### Ms. Nobrega's career with U.S. Airways

10.     From 2006 to 2015, Sharon Ms. Nobrega was employed as a Customer Service

Agent for U.S. Airways.

11.     Ms. Nobrega is a brown-skinned woman of African descent born in Guyana, in

South America.

12.     Ms. Nobrega was known for being outspoken against unfair practices, such as the

inclination of her manager, Ms. JayJay Levine, to give other Caucasian employees advantages in

bidding for assignments.

13.     For example, Ms. Levine made people of color, like Ms. Nobrega, make

appointments to submit timesheets to her, but did not require Caucasian employees to do this.

14.     Ms. Levine did not like Ms. Nobrega's vocal criticism of Ms. Levine's unfair

practices.

### Merger of U.S. Airways and American Airlines

15.     American Airlines ("American") and U.S. Airways merged in or around 2015.

16.     One of Ms. Nobrega's colleagues reported Ms. Levine to American for calling the employee n****r, a racial epithet hurled at, and reflecting historical animus against and contempt for, African-Americans.

17.     American demoted Ms. Levine.

18.     Ms. Nobrega began working at the American gate at Reagan National Airport in Arlington, Virginia.

19.     In or around 2017, Cynthia Thayer, a legacy American Airlines employee, began working at the same American Airlines gate with Ms. Nobrega.  Like many legacy American employees, Thayer arrived at the gate thirty minutes before the earliest gate departure of the day; Ms. Nobrega and legacy U.S. Airways Customer Service Agents typically arrived an hour earlier.

20.     One day, while Ms. Nobrega was boarding a flight, Thayer arrived and attempted to bully Ms. Nobrega.  Although Cynthia had the job of giving out seats ("controller"), she wanted to also do Ms. Nobrega's job of boarding passengers ("boarder"). Thayer not only told Ms. Nobrega that she was going to board the passengers instead of Ms. Nobrega, Thayer even tried to grab the microphone from Ms. Nobrega.  Ms. Nobrega told Thayer that she would continue boarding the passengers, did not relinquish the microphone, and kept boarding the passengers.

21.     A few days later, Ms. Nobrega entered the break room.  She saw that Ms. Thayer had been writing something on a tablet computer.  Thayer had been writing a negative message about a bad experience at the American gate – from the perspective of a passenger.

22.     A week later, Ms. Nobrega's manager called Ms. Nobrega into the office to discuss an overly concerning note from someone he believed to be a passenger, accusing Ms. Nobrega of being extremely rude to the customer at the American gate.

23.     Ms. Nobrega told her manager that Ms. Thayer, impersonating a customer, had written the review about her on a tablet in the break room the previous week.

24.     Ms. Nobrega noted that the review referenced Ms. Nobrega using her full name, information that no passenger had any reason to know.

25.     American allegedly investigated Ms. Nobrega's claims.

26.     Ms. Nobrega never heard any more about the alleged customer complaint about her.

27.     A few weeks later, Ms. Nobrega learned that Thayer, a former Communications Workers of America (CWA) Area Vice-President, had been elected President of CWA Local 2252 of CWA ("CWA Local 2252" or "the Union").  CWA Local 2252 represents Customer Service Agents and other employees of American Airlines, Piedmont Airlines, AT&T, Metropolitan Washington Airport Authority (MWAA), and Occupational Home Health Care.

28.     Also in 2017, an unfortunate incident occurred involving Ms. Nobrega's driving of a jetbridge, which is an enclosed, movable connector which most commonly extends from an airport terminal gate to an airplane, allowing passengers to board and disembark without going outside.

29.     When she was reversing the jetbridge, she was alleged to have struck a "tug" (luggage vehicle).

30.     The driver of the other vehicle, a member of an airport cleaning crew for an American vendor, was allegedly injured and sent to an emergency room.

31.     Ms. Nobrega's union representative failed to obtain a copy of a medical report indicating that, as alleged, the driver went to an emergency room.

32.     Ms. Nobrega was charged with level one disciplinary demerit.

**December 18, 2018 Incident in the Employee Parking Lot**

33.     At around 7:00 am, on the morning of December 18, 2018, Ms. Nobrega was arriving to work at Reagan National Airport for her 8:00 am shift.

34.     As she drove her vehicle into the employee parking lot, Romeo Hermano was preparing to leave.

35.     Mr. Hermano's shift ended at around the same time Ms. Hermano's 8:00 am shift began.  They knew one another from being around the parking lot at the same time of day and he often saved his space for her so that she could quickly park and get to work on time.

36.     As it was snowing that morning, Mr. Hermano was clearing snow and ice from his windshield when he saw Ms. Nobrega looking for a space, as usual.

37.     As usual, Mr. Hermano got in his car, to vacate the parking space, so that Ms. Nobrega could have it.

38.     While she was waiting for Mr. Hermano to vacate the parking space for her, another man, an employee of an airport vendor, pulled his car behind hers.

39.     When Mr. Hermano drove out of the parking space, the other man quickly sped into Ms. Nobrega's parking space before Ms. Nobrega could park.

40.     A shouting match followed in which the man called Ms. Nobrega a "b***h."

41.     Per the advice of Union shop steward Christina Riley, Ms. Nobrega provided MWAA police with two statements on December 19, 2018.

42.     On December 19, 2018, American managers Dawn Edinbyrd and Kevin Stearns interviewed Ms. Nobrega with Christina Riley present.  Ms. Nobrega provided a written statement of the incident.

43.     During this meeting, Edinbyrd and Stearns suspended Ms. Nobrega without pay pending the investigation.

44.     Mr. Hermano, who had pulled to the side on the morning of December 18, 2018 to finish clearing his windshield and other windows, witnessed what occurred and on December 19, 2018 provided a statement to the MWAA police indicating that he had been holding the space for Ms. Nobrega and that the man had cut her off and taken the space.

**The beginning, and the abrupt end, of Ms. Nobrega's union representation**

45.     According to Article 25 of Ms. Nobrega's union's collective bargaining agreement, if the employee does not make an oral complaint to an immediate supervisor, the Union may bypass the oral complaint and file a Step 1 grievance in writing to the local Director/Manager.  If a satisfactory decision is not reached at Step 1, the grievance may be appealed in a Step 2 writing by the Union within ten days after receipt of the Step 1 decision.  In Step 3, a grievance may be appealed in writing by the Union to the System Board of Adjustment. See American Airlines Passenger Service Agreement Between American Airlines, Inc. and CWA-IBT Association, December 1, 2015 [hereinafter *CBA*].

46.     In accordance with Section 204, Title II of the Railway Labor Act, Article 26 of the *CBA* establishes "a System Board of Adjustment for the purpose of" further "adjusting and deciding grievances."  A union member may provide written notice to the union, to American, and to the Board members seeking an arbitration.

47.     Ms. Nobrega was being advised and represented by CWA Local 2252 shop steward Christina Riley.

48.     Ms. Riley had lengthy substantive experience in representing union members in grievances.

49.     Ms. Riley had previously been a CWA national union representative before Thayer accused Riley of assaulting Thayer.

50.     After Thayer made this allegation about Ms. Riley, the Union demoted Ms. Riley from CWA union representative and she returned to being a full-time Customer Service Agent and ultimately, CWA Local 2252 shop steward.

51.     On December 21, 2018, Ms. Edinbyrd met again with Ms. Nobrega, her representative Christina Riley and Krystie Louis.

52.     Edinbyrd asked if Ms. Nobrega wanted to say anything other than what was on her statement from two days earlier.  Ms. Nobrega said that she had nothing to add.

53.     During a January 9, 2019 "Clarification Meeting," with Ms. Nobrega, Ms. Riley, Ms. Edinbyrd and Mr. Stearns, Edinbyrd said that the MWAA police would not give the American managers access to the police reports or witness statements.

54.     Ms. Edinbyrd then asked Ms. Nobrega, "Why do you think the alleged accuser called you a f****g crazy b***h?"  Ms. Nobrega stated that she did not know.

55.     Ms. Riley asked Ms. Edinbyrd, "What kind of question is that?"

56.     Ms. Edinbyrd stated that she asked that question because Ms. Nobrega had written in her statement that she told the accuser that "This is America, not Africa."

57.     Ms. Edinbyrd asked whether Ms. Nobrega knew that the accuser was from Ethiopia.  Ms. Nobrega stated that she had never seen the man before and had no idea where he was from.

58.     Ms. Riley stated that Ms. Nobrega had never said that, and that Ms. Edinbyrd needed to remove that allegation from her written notes.  Ms. Edinbyrd smiled and said that she would remove it from her notes.

59.     American Airlines accused Ms. Nobrega of making biased related comments in violation of American Airlines' Work Environment Policy Overview.  *See* Diane Cadrain, *American Airlines' Work Environment Policy Overview,* Society of Human Resource Mgmt. (March 1, 2001) ("American Airlines strictly prohibits harassment because of race, sex, gender, gender identity, religion, color, national origin, ancestry, mental or physical disability,  medical condition, union or nonunion affiliation, marital status, age, sexual orientation, or any other basis protected by federal, state, or local law or ordinance.") https://www.shrm.org/hr-today/news/hr-magazine/Pages/0303cadrainc.aspx#:~:text=American%20Airlines%27%20Work%20Environment%20Policy%20Overview.%20We%20are,equal%20opportunities%20and%20where%20all%20employees%20feel%20

60.     More specifically, American accused Ms. Nobrega of harassing the man based on his national origin and proposed her termination.  American accused Ms. Nobrega, an immigrant of African-descent of national origin discrimination, for allegedly yelling at the man, "This is America, not Africa!"

61.     Ms. Riley, after investigating the matter and representing Ms. Nobrega in the initial stages of the grievance Ms. Nobrega filed, believed that the Union should take Ms. Nobrega's case to arbitration.

62.     Ms. Riley went on vacation in early January 2019.

63.     After Ms. Riley returned from vacation in or around the week of January 7, 2019, the Union notified Ms. Nobrega and Ms. Riley that CWA had held a training course that Ms. Riley needed to take to remain eligible to represent union members in grievances or in any other way.

64.     CWA indicated that, due to lack of the certification, Ms. Riley could no longer represent Ms. Nobrega. CWA did not indicate when the next training course would take place.

**Termination of Ms. Nobrega**

65.     With Ms. Riley out of the way, on January 17, 2017, American Airlines issued Ms. Nobrega a written notice of termination entitled "Termination of Employment."

66.     The American manager on duty, Dawn Edinbyrd, never signed the "Termination of Employment" document.  Ms. Nobrega also never signed it.

67.     At a subsequent meeting Edinbyrd showed, from her cell phone, Ms. Nobrega, Thayer, Marvin Turpin, Mr. Ms. Nobrega's manager Kwame Atvanor, and others present a copy of a letter of termination that Edinbyrd claimed that both she and Ms. Nobrega had signed.

68.     Without Ms. Riley, Ms. Nobrega now had to find someone to represent her.

69.     Ms. Nobrega drove to the CWA Local 2252 offices in Manassas, Virginia pleading for new representation, to no avail.

70.     Ms. Nobrega contacted the union offices in Charlotte and in Baltimore but the union representatives who previously represented her in those places when she worked for U.S. Airways did not appear to be employed by American.

71.     The person who eventually represented her, new shop steward Tina Hatwater, had had been a legacy American employee.  Because American customer Service Agents had not been represented by a union, Hatwater had no experience representing union employees.

72.     For example, because Hatwater did not know that she could obtain official time during more than one day of the week to work on Ms. Nobrega's representation, she only worked one day each week on representing Ms. Nobrega.

73.     On May 15, 2019, Pamela Tronsor, International Staff Representative of CWA, called Ms. Nobrega. Tronsor asked whether she knew the vendor who stole her space and got into the confrontation with her.  Ms. Nobrega stated that Edinbyrd had stated that he was an employee of an aircraft cleaning company at the airport.  Ms. Nobrega stated that she did not know the man.

74.     Tronsor asked why she had not reported the incident to an American manager on December 19, 2018.  Ms. Nobrega replied that she spoke with Ms. Riley, who suggested that she notify the MWAA police about what occurred.  Ms. Nobrega asked Ms. Tronsor why the union had decided to reclassify Ms. Riley at such a critical time when Ms. Nobrega needed Ms. Riley's representation.  Ms. Nobrega again reminded Ms. Tronsor that she never said the words that Ms. Edinbyrd had attributed to her during the January 2019 "Clarification Meeting."

75.     On May 23, 2019, Pamela Tronsor, International Staff Representative of the union, issued Ms. Nobrega a written letter dated May 20, 2019 that Ms. Nobrega was guilty of hate speech, that her grievance had no merit and that the Union would decline to pursue the matter to arbitration.

76.     Ms. Nobrega personally wrote and filed a timely appeal to Local 213 District Vice-President Ed Mooney dated June 17, 2019.

77.     Mooney responded with a letter dated July 11, 2019 in which he accused Ms. Nobrega of lying.

78.     Ms. Nobrega submitted Grievance Appeal # DCA-012419 # C-DCA-2252-19007A to CWA President Christopher Shelton dated July 31, 2019. She stated that Mr. Mooney and Ms. Tronsor had both failed to account for the third witness, Mr. Hermano, and both misstated numerous statements attributed to Ms. Nobrega. She also pointed out that the Union never attempted to question or even to identify her accuser.  Furthermore, she denied the accuser's allegation that she crashed her vehicle into his sufficient to cause damage. Finally, she denied admitting to violating the American Work Environment Policy and indicated that American provided no statement from the accuser supporting the narrative that her conduct merited termination.

79.     CWA President Christopher Shelton issued her a letter dated September 4, 2019 (Decision) denying her appeal to arbitrate and agreeing with the decision of CWA District 2-13 Vice-President Edward Mooney.  Shelton's letter stated that the vendor employee had reported to the police and to his company that Ms. Nobrega slapped him, leaving a mark, and also told him the following:

> I hate you African people, I am going to kill you the next time I see you.

*       *       *       *       *

> So this happens all the time. He was Ethiopian and I told him go back to Africa, this is America, you can't do that. I was flinging my scarf around and talking loudly and he was calling me 'you crazy b***h.' He was going to do me something. I was flinging my scarf maybe I hit him because he told the police I assaulted him. They got curly hair like mine, Ethiopian – you know they look alike. I don't know who he is but he know me you know I tell the cleaners I don't want them on the jet bridge when I am moving it, you know they don't like strong women.

80.     Through an attorney, Ms. Nobrega filed a timely appeal of Shelton's letter September 30, 2019.

81.     On January 23, 2020, Sara Steffens, Secretary-Treasurer of CWA issued a letter denying Ms. Nobrega's last and final appeal:

> This will advise that the CWA Executive Board has considered your appeal after which they adopted the following motion:
>
> **Motion:** Move that the appeal of CWA Local 2252 member Sharon Ms. Nobrega be denied and  the decision of President Shelton be upheld.
>
> You have now exhausted your internal appeals procedures and there is no further action to be taken.

82.     Ms. Nobrega received this letter on February 6, 2020, six months ago.

## COUNT I -  BREACH OF THE DUTY OF FAIR REPRESENTATION

83.     Ms. Nobrega realleges and incorporates by reference all allegations and facts contained in this complaint as though fully set forth here.

84.     The Railway Labor Act, 45 U.S.C. § 152 ("Section 152"), specifies the general duties of carriers, their officers, agents, and employees, and the unions.

85.     Under the Railway Labor Act, CWA, as the exclusive bargaining agent of American Customer Service Agents, including Ms. Nobrega, owes Ms. Nobrega a duty of fair representation. *See Vaca v. Sipes*, 386 U.S. 171, 87 S. Ct. 903 (1967). This duty inherently includes a duty to perform a reasonable investigation. *See id*.; *See Turner v. Air Transport Dispatchers' Assoc*., 468 F.2d 297, 299-300 (5th Cir. 1972) ("It is beyond doubt that the duty of fair representation includes an obligation to investigate and to ascertain the merit of employee grievances").

86.     A union violates its duty of fair representation if its actions are arbitrary, discriminatory, or in bad faith. *Air Line Pilots Ass'n v. O'Neill*, 499 U.S. 65, 67, 11 S. Ct. 1127

14

(1991). A union's actions are arbitrary if the union exhibits egregious disregard for the union member or if the action was irrational. *Marquez v. Screen Actors Guild, Inc*., 525 U.S. 33, 46, 119 S. Ct 292 (1998). The union must especially avoid arbitrary or perfunctory behavior when the grievance involves an employment discharge — "the industrial equivalent of capital punishment." *Griffin v. Int'l Union*, 469 F.2d 181, 183 (4th Cir. 1972); *see also Miller v. Gateway Transp. Co., Inc*., 616 F.2d 272, 277 n. 12 (7th Cir. 1980).

87. A union must also provide to its members "similar treatment." *Buford v. Runyon*, 160 F.3d 1199, 1202 (8th Cir. 1998); *see also Vaca*, 386 U.S. at 191 (labor laws are designed to ensure that "similar complaints will be treated consistently"). *Cf. Carter v. United Food and Commercial Workers. Local No. 789*, 963 F.2d 1078, 1082 (8th Cir. 1992).

88. CWA, with American's collusion, breached its duty of fair representation and the terms and obligations imposed by its Constitution and Bylaws in at least each of the following ways:

a.  waiting for Ms. Nobrega's experienced shop steward representative to go on vacation before holding a required certification course without notice to Ms. Nobrega's shop steward representative, and decertifying and barring Ms. Nobrega's shop steward representative from representing Ms. Nobrega, days before Ms. Nobrega's termination;

b.  Assigning Ms. Nobrega a new shop steward with no experience in representing union members, and then summarily denying Ms. Nobrega's repeated objections and requests for fair representation;

c.  engaging in and endorsing the public defamation of Ms. Nobrega's character by union members, officials, and American management during the course of several pending investigations and her formal grievance;

15

d. refusing to provide information relevant to Ms. Nobrega's defense after she requested this information in good faith, including but not limited to information about discipline meted out to other union members American accused of violating its Work Environment Policy;

e. denying her meaningful grievance process participation at every turn in connection with both her informal and formal disputes with and wrongful termination from American;

f. irrationally refusing to submit her grievance to arbitration or to the American Systems Board of Adjustment or other arbitration, even though Ms. Nobrega had been a victim of unfair treatment, and unwarranted termination.

89. The union coordinated with American to decertify Ms. Riley from representing Ms. Nobrega and other union members, by notifying her of a requirement to become certified, and scheduling the certification training while Ms. Riley was on a scheduled vacation, barring Riley from representing Ms. Nobrega.

90. American terminated the unrepresented Ms. Nobrega just a few days after the Union decertified Ms. Riley.

91. The conduct of CWA and American has been arbitrary, irrational, discriminatory or in bad faith, such that it undermined the fairness or integrity of the grievance process.

92. The conduct of CWA and CWA Local 2252 has been based upon Ms. Thayer's and subsequently other union officials' personal animosity against Ms. Nobrega and Ms. Riley.

93. The Fourth provision of 45 U.S.C. § 152 makes it unlawful for airlines to interfere with employees' rights to organize. See § 152, Fourth.

94.     Accordingly, in the present case, CWA owed Ms. Nobrega a duty of fair representation in connection with Ms. Nobrega's informal disputes in connection with her employer and unions' arbitrary, illogical, and discriminatory actions taken against her, and resulting in wrongful termination from American.

## COUNT II – BREACH OF THE COLLECTIVE BARGAINING AGREEMENT

95.     Ms. Nobrega realleges and incorporates by reference all allegations and facts contained in this complaint as though fully set forth here.

96.     A union member may sue her employer for breach of the collective bargaining agreement if she also sues her union for a breach of the duty of fair representation. An employer is jointly liable with a union for the union's breach of its duty of fair representation if the employer participates in the union's breach. *See, e.g., United Independent Flight Officers, Inc. v. United Air Lines, Inc.*, 756 F.2d 1274 (7th Cir. 1985) (citing *Alvey v. General Electric Co.*, 622 F.2d 1279, 1290 (7th Cir.1980)).

97.     Ms. Nobrega alleges CWA breached its duty of fair representation in relation to her formal grievance proceedings arising out of her retaliatory termination, as well as her informal disputes with American arising out of her ASAP acceptance then expulsion and Mediated Debrief denial.

98.     Under *Corzine*, American's actions constitute a breach of the Collective Bargaining Agreement because American contributed to CWA's breach of its duty to fairly represent Ms. Nobrega.

99.     American collusively engaged systematic directing, inducing, and conspiring with CWA for the purpose of denying Ms. Nobrega many of her rights—including her right to fair representation—under, and in violation of the *CBA*.

100.    American breached the *CBA* by directing, inducing, and colluding with CWA for the purpose of denying Ms. Nobrega's right to meaningful and legitimate grievance proceedings the *CBA*.

101.    Specifically, American conspired with CWA to make a sham of its grievance procedure, thereby allowing Ms. Nobrega's unreasonable discharge to stand.

102.    Specifically, American intentionally disregarded evidence, facts and testimony from the accuser and Ms. Nobrega's witness concerning the events of December 18, 2019.

103.    Rather than fully cooperating with CWA to provide Ms. Nobrega employment as required under the *CBA*, American conspired with CWA to discriminate against Ms. Nobrega and effect her unlawful termination.

104.    American breached the *CBA* by wrongfully terminating Ms. Nobrega.

105.    American breached the *CBA* by effecting her termination in retaliation for her record of speaking out against discrimination.

## COUNT III - WRONGFUL TERMINATION

106.    Ms. Nobrega realleges and incorporates by reference all allegations and facts contained in this complaint as though fully set forth here.

107.    Union lacked just cause to terminate Ms. Nobrega because no biased, fair, and firm investigation of the grievance occurred.

108.    American provided Ms. Riley with no information concerning the similar violations of the Work Environment Policy to demonstrate whether alleged violators of the Work Environment Policy were consistently and equitably treated.

109.    Additionally, no progressive discipline was applied.

110.    Ms. Nobrega was terminated based on making statements she never made.

111.    Even assuming arguendo that Ms. Nobrega made the statements American and CWA accused her of making, the penalty of termination was too harsh based on her existing conduct and performance record with American and U.S. Airways.

## PRAYER FOR RELIEF

112.    Ms. Nobrega realleges and incorporates by reference all allegations and facts contained in this complaint as though fully set forth here.

113.    Ms. Nobrega respectfully prays for judgment including:

a.    Full back pay for Ms. Nobrega's unwarranted termination, plus interest, pension rights, and other benefits;

b.    Damages for harm to Ms. Nobrega's career at American and to her professional reputation in the airline Customer Service Agent industry;

c.    An order expunging the unwarranted termination from Ms. Nobrega's record, *see Hines v. Anchor Motor Freight, Inc*., 424 U.S. 554 (1976);

d.    Punitive and exemplary damages in an amount to be determined by the jury;

e.    Reasonable attorneys' fees and costs; and

f.    Any other relief in law or equity to which Ms. Nobrega may be justly entitled.

## JURY DEMAND

114.    Nobrega demands trial by jury on all issues.

August 6, 2020                          Respectfully submitted,

GERALD L. GILLIARD, ESQ.
1629 K Street, N.W., Suite 300
Washington, DC 20006
Telephone: (202) 827-9753
Fax: (202) 478-1783
Email: ggilliard@employmentlegalteam.com
*Attorney for the Complainant*